**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| STANLEY FORD, | CASE NO. 5:24-CV-01502 |
| Petitioner, | JUDGE DAN AARON POLSTER |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| WARDEN ANGELA STUFF, | |
| Respondent. | **REPORT AND RECOMMENDATION** |

Petitioner Stanley Ford ("Mr. Ford" or "Petitioner") filed the pending habeas corpus petition under 28 U.S.C. § 2254 on August 7, 2024.  (ECF Doc. 1 ("Petition").)  In the Petition, he asserts one ground for relief that challenges his convictions in Summit County Court of Common Pleas, Case No. CR-2017-06-1953, for multiple counts of aggravated murder, aggravated arson, and attempted aggravated murder.[1]  (*Id.*)

The matter was assigned to the undersigned Magistrate Judge pursuant to Local Rule 72.2.  The case is briefed and ripe for disposition.  (ECF Docs. 7, 17, 19-1.)  For the reasons set forth herein, the undersigned recommends that the Court **DENY** Ground One on its merits.

## I.    Factual Background

"In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a

---

[1]  The Petition was docketed on September 3, 2024.  (ECF Doc. 1.)  "Under the mailbox rule, a habeas petition is deemed filed when the prisoner gives the petition to prison officials for filing in the federal courts." *Cook v. Stegall*, 295 F.3d 517, 521 (6th Cir. 2002) (citing *Houston v. Lack*, 487 U.S. 266, 273 (1988)).  Mr. Ford states that he placed the Petition in the prison mailing system on August 7, 2024.  (ECF Doc. 1, p. 16.)

1

State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). The petitioner has the burden of rebutting that presumption by clear and convincing evidence. *See id.*; *Railey v. Webb*, 540 F.3d 393, 397 (6th Cir. 2008).

The Ninth District Court of Appeals summarized the facts underlying Mr. Ford's convictions and his motion to suppress as follows:

> {¶2} This appeal arises as a result of three fires occurring within thirteen months of each other in the same Akron neighborhood. On April 18, 2016, a fire was intentionally started at a residence located at 719 Fultz Avenue, in Akron, Ohio. Two individuals were killed in that fire, and one individual escaped. On January 23, 2017, a vehicle was set on fire at 723 Russell Avenue, in Akron, Ohio. On May 15, 2017, a fire was intentionally started at a residence located at 693 Fultz Avenue, in Akron, Ohio. Seven individuals, including five children, and the family dog were killed in that fire. The three fires occurred at addresses in very close proximity to Mr. Ford's residence located at 1370 Hillcrest Street, Akron, Ohio, and Mr. Ford's deceased mother's residence located at 1374 Hillcrest Street, Akron, Ohio.

> {¶3} John Weber, an investigator and K-9 handler with the state fire marshal's office, investigated both residential fires. K-9 India, trained in accelerant or ignitable liquid detection, alerted to the presence of accelerant on the porches of both residences, and on the west side of the residence at 719 Fultz Avenue. During a search of Mr. Ford's two residences, K-9 India also alerted to a coat, black sweatpants, and containers labeled "gasoline" and "charcoal lighter fluid." Brian Peterman, an investigator with the state fire marshal's office, indicated both fires originated on the front porches. Specifically, the 719 Fultz Avenue fire originated on the "front porch of the house, on the west side."

> {¶4} Video surveillance footage of the 719 Fultz Avenue fire showed an individual carrying a container igniting the fire by the front porch on the west side of the residence. Further, video surveillance footage of the 693 Fultz Avenue fire showed an individual quickly moving between 1370 Hillcrest Street, 1374 Hillcrest Street, and 693 Fultz Avenue at the time of the fire. This video footage also showed a "flash" when the 693 Fultz Avenue fire was ignited. Alarm.com records showed the security alarm at 1374 Hillcrest Street, Mr. Ford's deceased mother's residence, was disarmed using Mr. Ford's assigned code prior to the start of both fires. Several individuals in the neighborhood corroborated Mr. Ford had ongoing issues with the individuals living at 719 Fultz Avenue and 693 Fultz Avenue. One individual also indicated Mr. Ford believed God placed him in the neighborhood as its guardian angel.

> . . .

2

{¶6} Subsequent to a jury trial, Mr. Ford was convicted of twenty-two counts of Aggravated Murder, two counts of Attempted Aggravated Murder, and two counts of Aggravated Arson.

. . .

{¶48} On May 23, 2017, Mr. Ford was transported in handcuffs by the Akron Police to the Akron Police Department and placed in an interview room. [Fn. 5 The interview was video-taped and recorded and lasted approximately 4 hours and 15 minutes.] Approximately 20 minutes later, at 10:58 a.m., Sergeant Troy Looney and Detective John Bell entered the interview room. After an initial exchange of biographical and contact information, Sergeant Looney informed Mr. Ford he was going to read him his rights and Mr. Ford needed to respond "yes" or "no." The following exchange then occurred:

* * *

SERGEANT LOONEY: You have the right to remain silent. Do you understand that?

MR. FORD: Yes.

SERGEANT LOONEY: Okay. Anything you say can and will be used against you in a court of law. Do you understand that?

MR. FORD: Yes.

SERGEANT LOONEY: You have the right to talk to your lawyer, have him or her present with you while you're being questioned. Do you understand that?

MR. FORD: Yes.

SERGEANT LOONEY: If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish. Do you understand that?

MR. FORD: Yes.

SERGEANT LOONEY: You can decide at any time to exercise these rights and not answer any questions or make any statements. Do you understand that?

STANLEY FORD: Yes.

* * *

Sergeant Looney informed Mr. Ford that the Akron Police had done a lot of work in the past couple days and there were new developments in the case. Detective Bell informed Mr. Ford there are now warrants out for his arrest, and Mr. Ford asked, "[f]or what?" Detective Bell then asked Mr. Ford to talk about the day in

question, May 15, 2017, and to tell them about the fire. Detective Bell further asked Mr. Ford to "go back to the very beginning of [this], the reason why we came to your house initially." Mr. Ford responded, "Okay. Let's hold it. I'd rather have counsel now."

Sergeant Looney indicated, "Okay," and Mr. Ford continued, "[b]ecause you guys got warrants that I did it. I'm telling you I didn't do it. I'd just rather have counsel now." Sergeant Looney told Mr. Ford "if at any time you choose to talk to us," we are still available. Detective Bell then asked Sergeant Looney to "explain" Mr. Ford's charges. Sergeant Looney told Mr. Ford he has seven charges and offered to show him. At that time, Mr. Ford stated, "I don't know how I'm being charged. I didn't do it. That's stuff I didn't do." Sergeant Looney indicated they wanted to speak with Mr. Ford if he wanted to speak with them. Mr. Ford said, "[n]o," and then continued, "I'd rather have counsel now because you're accusing me of something I didn't do." Mr. Ford then asked, "[w]hat are you going to do? You guys already got a warrant[,]" and then stated, "[y]ou gonna take me to jail." Sergeant Looney inquired, "[d]o you want to keep talking to me[,]" and Mr. Ford responded, "I'd rather talk to a lawyer, man." After telling Mr. Ford he has seven counts of aggravated murder against him, Mr. Ford asked, "[s]o what's going to happen now?" Detective Bell responded that Mr. Ford was being charged with arson. Mr. Ford continued asking why he was being charged and continued to deny his involvement in the fire, indicating he "wouldn't wish that on anybody." After additional back-and-forth conversation between Mr. Ford, Sergeant Looney and Detective Ball, wherein Mr. Ford continued to repeatedly deny involvement in the fire and stated, "if I could help you, I would, man[,]" Sergeant Looney re-read Mr. Ford his *Miranda* rights at 11:06 a.m. Mr. Ford answered "yes" to each question and the interview continued for several more hours.

. . .

{¶50} We accept the trial court's findings of fact, which have not been challenged by Mr. Ford, because they are supported by competent, credible evidence.

*State v. Ford*, 2023-Ohio-2220, ¶¶ 2-6, ¶¶ 48-50 (Ohio Ct. App. June 30, 2023) (alterations in

original); (*see* ECF Doc. 7-1, pp. 587-89, 611-13.)

## II.      Procedural Background

### A.      State Court Conviction

The Ninth District Court of Appeals summarized Mr. Ford's indictment as follows:[2]

---

[2] The indictment itself is not in the record.  (*See* ECF Doc. 7-1.)

{¶ 5} Mr. Ford was indicted on twenty-two counts of Aggravated Murder, in violation of R.C. 2903.01(A)/(B)/(C), special felonies with Death Penalty Specifications and Repeat Violent Offender Specifications, two counts of Aggravated Arson, in violation of R.C. 2909.02(A)(1), felonies of the first degree, with Repeat Violent Offender Specifications, one count of Cruelty Against Companion Animal, in violation of R.C. 959.131(C), a felony of the fifth degree, with a Repeat Violent Offender Specification, two counts of Attempted Aggravated Murder, in violation of R.C. 2903.01, felonies of the first degree, with Repeat Violent Offender Specifications, one count of Arson, in violation of R.C. 2909.03 a misdemeanor of the first degree, and one count of Aggravated Menacing, in violation of R.C. 2903.21, a misdemeanor of the first degree.

*Ford*, 2023-Ohio-2220, at ¶ 5.

Prior to trial, through court-appointed counsel, Mr. Ford filed a motion to suppress "any and all statements obtained as a result of his interrogation, detention and arrest as well as any and all evidence derived as a result of said unlawful interrogation, detention and arrest." (ECF Doc. 7-1 at p. 14.) He based the motion on allegations that he was not adequately advised of his *Miranda* rights before being interrogated by police and that police improperly continued to interrogate him after he invoked his right to counsel. (*Id.* at pp. 16-26.) The State did not file a written response, but the trial court held a suppression hearing on March 13, 2018, and denied Mr. Ford's motion to suppress. (*Id.* at pp. 27-45; ECF Doc. 7-2, pp. 2-183.)[3]

On March 10, 2020, through counsel, Mr. Ford waived his right to a jury trial on the Repeat Violent Offender (RVO) specifications. (ECF doc. 7-1, p. 146.) A jury trial on the rest of the indictment commenced on February 18, 2020, but was suspended due to the COVID-19 pandemic on March 17, 2020. (*Id.* at p. 149.) On April 30, 2020, Mr. Ford filed a motion for a mistrial due to the length of time since the jury had heard testimony and the potential impact of COVID-19 pandemic safety protocols on a trial. (*Id.* at pp. 149-58, 230-34 (supplement to the

---

[3] The trial court also held hearings and ruled on a motion to sever the indictment (ECF Doc. 7-1, pp. 106-11) and the issue of Mr. Ford's competency (*id.* at 140-45). The motion to sever was denied (*id.* at p. 111), and Mr. Ford was found competent to stand trial (*id.* at p. 145). Neither of these rulings is at issue in the present habeas Petition.

motion).)  The trial court initially denied the motion (*id.* at pp. 288-99) but later declared a mistrial due to the delays and concerns relating to the COVID-19 pandemic (*id.* at pp. 403-06).

Prior to the second trial, Mr. Ford again waived his right to a jury trial on the RVO specifications.  (*Id.* at pp. 414-16.)  A jury trial on the rest of the indictment was held from August 27, 2021, through September 20, 2021.  (*Id.* at p. 417.)   The jury found Mr. Ford guilty of 22 counts of aggravated murder, 2 counts of attempted aggravated murder, and 2 counts of aggravated arson.  (*Id.* at pp. 417-28.)  The jury found him not guilty of cruelty against companion animal, arson, and aggravated menacing.  (*Id.* at pp. 426, 428.)  The trial court found Mr. Ford guilty of all RVO specifications.  (*Id.* at p. 441.)

Following a mitigation hearing held from September 28 through 30, 2021, the jury found that the aggravating circumstances of Mr. Ford's crimes did not outweigh mitigating factors beyond a reasonable doubt, opted to reject the death penalty, and recommend life imprisonment without the possibility of parole.  (*Id.* at pp. 431-34.)  After merging several convictions and RVO specifications, the trial court sentenced Mr. Ford to nine consecutive terms of life imprisonment without the possibility of parole plus an additional term of 21 consecutive years on October 29, 2021.  (*Id.* at pp. 441-45.)

**B.    Direct Appeal**

On November 10, 2021, Mr. Ford filed a notice of appeal with the Ninth District Court of Appeals through new appointed counsel.  (ECF Doc. 7-1, p. 452.)  In his appellate brief (*id.* at pp. 469-505), he raised the following assignments of error:

1.  The trial court abused its discretion when it found Mr. Ford competent to stand trial based on evidence that was not reliable and credible. Fifth and Fourteenth Amendments, U.S. Constitution; Article I, Section 16, Ohio Constitution.

2.  The trial court erred when it allowed a single trial to be held for charges related to three separate arson incidents that occurred over a period of 13 months. Fifth, Sixth, and Fourteenth Amendments, U.S. Constitution; Article I,

Sections 10 and 16, Ohio Constitution; Crim.R. 14.

3. Prosecutorial misconduct denied Mr. Ford a fair trial and due process of law. Fifth and Fourteenth Amendments, U.S. Constitution; Article I, Sections 10 and 16, Ohio Constitution.

4. The trial court abused its discretion when it allowed a state's witness—neither a lay witness as to any relevant facts nor an expert witness—to testify regarding his investigative work product, in the form of narrative Adobe PDF slideshows and highly selective timelines, which work product was ultimately admitted into evidence as state's exhibits.

5. The trial court erred when it failed to suppress statements unlawfully obtained after Mr. Ford's unequivocal request for counsel during a custodial interrogation. Fourth and Fourteenth Amendments, U.S. Constitution; Article I, Section 16, Ohio Constitution.

6. The trial court erred when it ordered Mr. Ford to solitary confinement for six separate days—the anniversaries of the offenses and the birthdays of the five child-victims.

(*Id.* at pp. 470-71). The state filed its appellate brief (*id.* at pp. 522-57), and Mr. Ford filed a reply (*id.* at pp. 574-85). On June 30, 2023, the Ninth District Court of Appeals affirmed the trial court's judgment. (*Id.* at pp. 587-617.)

On August 14, 2023, Mr. Ford, through counsel, filed a notice of appeal with the Supreme Court of Ohio (*id.* at pp. 633-34) and a memorandum in support of jurisdiction (*id.* at pp. 635-43). He raised the following proposition of law:

1. When an interrogating officer construes a suspect's statement as a request for counsel, a reviewing court may not substitute its own judgment for that of the officer without a finding that the officer's belief was unreasonable.

(*Id.* at p. 636.) The state filed a memorandum in opposition on September 11, 2023. (*Id.* at pp. 646-53.) The Supreme Court of Ohio declined to accept jurisdiction of the appeal on October 24, 2023. (*Id.* at p. 654.)

**C.       Federal Habeas Corpus Petition**

Mr. Ford raises one ground for relief in his Petition:

7

**Ground One:**  Petitioner was denied right to counsel and due process of law in violation of Fifth Sixth, and Fourteenth Amendment under the U.S. Constitution.

(ECF Doc. 1, pp. 6; ECF Doc. 1-1, pp. 3-7.)

### III.    Law & Analysis

**A.    Standard of Review Under AEDPA**

The Antiterrorism and Effective Death Penalty Act of 1996, PL 104–132, April 24, 1996, 110 Stat 1214 ("AEDPA") limits the adjudication of federal habeas petitions in which state prisoners have collaterally attacked their convictions.  *See Reed v. May*, 134 F.4th 455, 459 (6th Cir.), *cert. denied sub nom. Reed v. Fredrick*, 146 S. Ct. 226, 223 L. Ed. 2d 78 (2025); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) ("As amended by AEDPA, 28 U.S.C. § 2254 sets several limits on the power of a federal court to grant an application for a writ of habeas corpus on behalf of a state prisoner.").  Under 28 U.S.C. § 2254, as amended by AEDPA, federal courts may "entertain only those applications alleging that a person is in state custody 'in violation of the Constitution or laws or treaties of the United States'" and in most instances, federal courts may not grant habeas relief "unless . . . the applicant has exhausted state remedies." *Cullen*, 563 U.S. at 181 (citing 28 U.S.C. §§ 2254(a), (b), (c)).

"AEDPA's 're-litigation bar' applies when a state court denies a prisoner's claim on the merits, rather than denying it for procedural reasons."  *Reed*, 134 F.4th at 459 (citing 28 U.S.C. § 2254(d); *Harrington v. Richter*, 562 U.S. 86, 98 (2011)).  Under the "re-litigation bar," when a federal habeas application involves a claim that was "adjudicated on the merits in State court proceedings," the application "shall not be granted" unless the State court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

8

(2) resulted in a decision that was based on an unreasonable determination of
the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2); *Cullen*, 563 U.S. at 181; *Harrington*, 562 U.S. at 100.  The burden of

proof rests with the petitioner.  *See Cullen*, 563 U.S. at 181.

Under § 2254(d)(1), "[a] state court decision is 'contrary to' clearly established federal

law if it (1) 'applies a rule that contradicts governing Supreme Court law' or (2) confronts

'materially indistinguishable' facts from a Supreme Court case and arrives at a different result."

*Reed*, 134 F.4th at 459 (quoting *Smith v. Nagy*, 962 F.3d 192, 198 (6th Cir. 2020) (citation

omitted)).  A state court's adjudication results in an "unreasonable application" of clearly

established federal law when it "correctly identifies the governing legal rule but unreasonably

applies it to the facts."  *Id.* (quoting *Smith*, 962 F.3d at 199 and citing *White v. Woodall*, 572 U.S.

415, 426-27 (2014)).

Under § 2254(d)(2), "when a federal habeas petitioner challenges the factual basis for a

prior state-court decision rejecting a claim, the federal court may overturn the state court's

decision only if it was 'based on an unreasonable determination of the facts in light of the

evidence presented in the State court proceeding.'"  *Burt v. Titlow*, 571 U.S. 12, 18 (2013)

(quoting and citing 28 U.S.C. § 2254(d)(2)).  The Sixth Circuit has explained that "[a] state court

decision involves 'an unreasonable determination of the facts in light of the evidence presented

in the State court proceeding' only if it is shown that the state court's presumptively correct

factual findings are rebutted by 'clear and convincing evidence' and do not have support in the

record."  *Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007) (quoting and citing 28 U.S.C. §

2254(d)(2) and § 2254(e)(1)); *see Sumner v. Mata,* 449 U.S. 539, 546-47 (1981) (holding that the

presumption of correctness also applies to factual findings made by a state appellate court based

on the trial record).  "[A] state-court factual determination is not unreasonable merely because

9

the federal habeas court would have reached a different conclusion in the first instance." *Burt*, 571 U.S. at 18 (internal citations and quotations omitted).

The Sixth Circuit has explained that "AEDPA authorizes a federal court to grant a writ of habeas corpus for state prisoners only to guard against 'extreme malfunctions in the state criminal justice systems.'" *Hodge v. Plappert*, 136 F.4th 648, 657 (6th Cir. 2025), *cert. denied*, 223 L. Ed. 2d 535, 2026 WL 79639 (U.S. Jan. 12, 2026) (quoting *Shinn v. Ramirez*, 596 U.S. 366, 377 (2022)).  This is because "Congress recognized that '[f]ederal habeas review of state convictions frustrates both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights.'" *Id*. at 657-58 (quoting *Harrington*, 562 U.S. at 103 (brackets in original).  "Congress designed 28 U.S.C. § 2254(d) to remind federal courts that 'state courts are the principal forum for asserting constitutional challenges to state convictions.'" *Id*. at 658 (quoting *Harrington*, 562 U.S. at 103).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

## B.    First Ground for Relief

In his sole ground for relief, Petitioner argues that his constitutional rights were violated when the state court of appeals upheld the admission of testimony from his May 2017 custodial interview with police at trial.  (ECF Doc. 1, p. 6; ECF Doc. 1-1, pp. 3-7.)  In upholding the admission of the testimony, the state court of appeals acknowledged that some of Mr. Ford's remarks during the interview "indicate[d] a preference for counsel," but concluded that his "multiple ambiguous references regarding counsel, in conjunction with his ongoing questions about the investigation and assertions of innocence" ultimately "d[id] not rise to the level of the

invocation of Mr. Ford's right [to counsel]."  *See Ford*, 2023-Ohio-2220, at ¶¶ 51-52.  Mr. Ford argues that this decision was (1) "contrary to and an unreasonable application of federal law set forth in *Miranda v. Arizona*, 384 U.S. 436 (1966) and *Edwards v. Arizona*, 451 U.S. 477 (1981)"; and (2) "based on [an] unreasonable determination of the facts in light of the evidence presented at trial."  (ECF Doc. 1-1, pp. 5-7.)  More specifically, he argues that his requests for counsel were clearly articulated, and that the police officers ignored those requests when they continued to question and badger him into further conversation.  (*Id.* at pp. 5-6; ECF Doc. 19-1, pp. 10-15.)  He also argues that the state court erred when it independently considered what an objectively reasonable officer might believe about Mr. Ford's statements rather than adopting the subjective belief of one of the interrogating officers who testified at the suppression hearing. (ECF Doc. 1-1, p. 7; ECF Doc. 19-1, pp. 15-17.)

In response, Respondent asserts that: the state court correctly applied the Supreme Court standard when it found Mr. Ford did not unambiguously invoke his right to counsel; there is no evidence Mr. Ford unambiguously invoked his right to remain silent; Mr. Ford was responsible for reinitiating the conversation with the police officers after his alleged invocation of the right to counsel; any potential constitutional error was remedied when officers re-read Mr. Ford's *Miranda* rights and he said he understood; there was no evidence of coercion; and there is no evidence that the admitted statements had an injurious influence on the verdict or rendered Mr. Ford's trial fundamentally unfair.  (ECF Doc. 7, pp. 23-25.)

### 1.    Legal Standard for Invoking Right to Counsel in Custodial Interrogation

In *Miranda v. Arizona*, the Supreme Court held that certain procedural safeguards must be afforded to criminal suspects before a custodial interrogation by law enforcement "to secure the privilege against self-incrimination."  384 U.S. at 444.  Specifically, the suspect "must be

warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Id.* at 479; *see id.* at 444. While a suspect may "waive effectuation of these rights," the *Miranda* Court specified "there can be no questioning" once the suspect indicates "he wishes to consult with an attorney before speaking[.]" *Id.* at 444-45. In other words, if the suspect states that "he wishes to remain silent, the interrogation must cease," and if he states that "he wants an attorney, the interrogation must cease until an attorney is present." *Id.* at pp. 473-74.

The Supreme Court clarified in *Edwards v. Arizona* that a suspect who has "expressed his desire to deal with the police only through counsel" may not be subject to "further interrogation by authorities until counsel has been made available to him, *unless* the accused himself initiates further communication, exchanges, or conversations with the police." 451 U.S. at 484-85 (emphasis added). This is because "[t]he Fifth Amendment right identified in *Miranda* is the right to have counsel present at any custodial interrogation," and there is no infringement if there is no interrogation. *Id.* at 485-86. An interrogation includes "express questioning" and "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

In *Smith v. Illinois*, 469 U.S. 91 (1984), the Court explained that the "'rigid' prophylactic rule" from *Edwards* requiring the waiver of a request for counsel prior to further interrogation:

> embodies two distinct inquires. First, courts must determine whether the accused actually invoked his right to counsel. . . . Second, if the accused invoked his right to counsel, courts may admit his responses to further questioning only on the finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked.

12

*Id.* at 95 (citations omitted). The first inquiry—whether the suspect actually invoked his right to counsel—requires that a suspect "unambiguously request counsel" for the rule to apply. *Davis v. United States*, 512 U.S. 452, 459 (1994). Specifically, the suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.* Conversely, if the suspect "makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," the right was not invoked, and the interrogation may continue. *Id.* (emphasis in original). "To avoid difficulties of proof and to provide guidance to officers conducting interrogations," courts make an objective inquiry into whether a request was unambiguous. *Id.*

The second inquiry—whether the suspect waived his right to counsel—is "designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." *Id.* at 458. The question in this inquiry is "whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case." *North Carolina v. Butler*, 441 U.S. 369, 373 (1979). While an "express written or oral statement of waiver" may be strong proof of the validity of a waiver, courts should consider "'the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" *Butler*, 441 U.S. at 374-75 (citation omitted). Under this standard, the Supreme Court explained that a suspect's "silence, coupled with an understanding of his rights and a course of conduct indicating waiver" could support a conclusion that he has waived his rights. *Id.* at 374.

**2.       State Court Adjudication Regarding Statements Petitioner Made to Police**

In its June 30, 2023 opinion, the Ninth District Court of Appeals addressed Petitioner's argument that the trial court erred in denying his motion to suppress statements he made to police during his May 2017 interview as follows:

{¶44} In his fifth assignment of error, Mr. Ford argues the trial court erred in failing to suppress statements made during a custodial interrogation on May 23, 2017, based on his belief the statements were unlawfully obtained after he made an "unequivocal" request for counsel.

{¶45} A motion to suppress evidence presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. "When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *Id.*, *citing State v. Mills*, 62 Ohio St.3d 357, 366, 582 N.E.2d 972 (1992). Thus, a reviewing court "must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Burnside* at ¶ 8. "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706, 707 N.E.2d 539 (4th Dist.1997).

{¶46} "Invocation [of the right to counsel] and waiver are entirely distinct inquiries, and the two must not be blurred by merging them together." *State v. Raber*, 9th Dist. Wayne, 189 Ohio App.3d 396, 2010-Ohio-4066, 938 N.E.2d 1060, ¶ 16, quoting *Smith v. Illinois*, 469 U.S. 91, 98, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984). "First, courts must determine whether the accused actually invoked his right to counsel." *Raber* at ¶ 16, quoting *Smith* at 95, 105 S.Ct. 490. A waiver-of-invocation inquiry becomes relevant only after a proper invocation occurs. *Id.* "If an accused makes a statement concerning the right to counsel 'that is ambiguous or equivocal' or makes no statement, the police are not required to end the interrogation [ ] or ask questions to clarify whether the accused wants to invoke his or her Miranda rights." (Internal citation omitted.) *Berghuis v. Thompkins*, 560 U.S. 370, 381, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010), quoting *Davis v. United States*, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). Accordingly, we must now consider whether Mr. Ford unambiguously and unequivocally invoked his right to counsel.

{¶47} "The question whether a suspect invoked his or her right to counsel is an 'objective inquiry.'" *Raber* at ¶ 17, quoting *Davis* at 459, 114 S.Ct. 2350. Further, a suspect's alleged invocation must be examined "not in isolation but in context." *Id.* quoting *State v. Murphy*, 91 Ohio St.3d 516, 520-521, 747 N.E.2d 765 (2001). "[A] reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel * * * do[es] not require the cessation of questioning." (Emphasis sic.) *Davis* at 459, 114 S.Ct. 2350. "For example, statements such as, 'I think I need a lawyer,' 'Maybe I should talk to a lawyer,' and 'I think that I would like an attorney' have been deemed too ambiguous to invoke the Miranda right to counsel." *State v. Zaffino*, 9th Dist. Summit No. 21514, 2003-Ohio-7202, 2003 WL 23095392, ¶ 58, quoting *State v. Henness*, 79 Ohio St.3d 53, 63, 679 N.E.2d 686 (1997); *Davis* at 462, 114 S.Ct. 2350; and *State v. Taylor*, 9th Dist. Medina No. 2783-M, 1999 WL 61619, *2. "If ambiguous requests for counsel

could suffice for invocation purposes, '[p]olice officers would be forced to make difficult judgment calls about whether the suspect in fact wants a lawyer even though he has not said so, with the threat of suppression if they guess wrong.'" *Raber* at ¶ 17, quoting *Davis* at 461, 114 S.Ct. 2350.

. . .

{¶ 51} . . . based upon this record, we cannot say the trial court erred in denying Mr. Ford's motion to suppress and admitting Mr. Ford's May 23, 2017 statements into evidence. Importantly, Mr. Ford has not argued he did not understand his *Miranda* rights or that his statements were involuntary or the product of coercion. The record does not reveal Sergeant Looney or Detective Bell made any threats or promises to Mr. Ford. Indeed, Mr. Ford's remarks that he would "rather" have counsel now, or talk to a lawyer, were not definitive. While these remarks indicate a preference for counsel, they do not rise to a level of the invocation of Mr. Ford's right. *See State v. Stover*, 9th Dist. Lorain No. 96CA006461, 1997 WL 193333, *3 (Apr. 16, 1997) (This Court reversed a ruling suppressing the defendant's statements where the defendant made five ambiguous or equivocal references to his attorney, including: (1) "My lawyer won't make any money today[;]" (2) "I feel like, talk to my, have my lawyer present[;]" (3) "He said he was going to come here he said yesterday, today's Friday right[;]" (4) "He said he was [supposed] to come yesterday or today" [;] (5) "Well I mean, I'd still like to have my lawyer here[.]"). *Compare State v. Tench*, 156 Ohio St.3d 85, 2018-Ohio-5205, 123 N.E.3d 955, ¶ 90, (where the Supreme Court of Ohio indicated the defendant unambiguously invoked his right to counsel by stating he "need[ed] a number out of [his phone] * * * to *call [his] attorney.*" (Emphasis in original.))

{¶52} Mr. Ford's multiple ambiguous references regarding counsel, in conjunction with his ongoing questions about the investigation and assertions of innocence, created enough confusion for Sergeant Looney to re-*Mirandize* Mr. Ford in order to keep speaking with him. *See State v. Murphy*, 91 Ohio St.3d 516, 520, 747 N.E.2d 765. ("If the suspect says something that may or may not be an invocation of the right, police may continue to question him; they need not treat the ambiguous statement as an invocation or try to clear up the ambiguity.") After being re-*Mirandized*, Mr. Ford spoke with Sergeant Looney and Detective Bell, answering their questions for an additional 3¾ hours. During this portion of the interview, Mr. Ford did not unambiguously or unequivocally invoke his right to counsel.

{¶53} It was during this portion of the interview Mr. Ford made hypothetical statements about not seeing any fire *if* he had been outside at the relevant time, and *if* the police had him on camera. For example, Mr. Ford stated, "[i]f I would have saw a fire down there at that time, I would have screamed -- I would have screamed at the top of my lungs, tell the neighbors a fire, knock on somebody's door. I didn't see no damn fire." Mr. Ford also stated, "[s]ee, if you got me on camera doing that, there wasn't no damn fire down there. There wasn't no fucking fire down there. I'm telling you guys the truth. There wasn't no fucking fire down there, man."

15

These statements, which were *not* confessions to the crimes, were subsequently admitted into evidence at trial. Moreover, during this portion of Mr. Ford's police interview, he continued to adamantly deny any involvement in the 693 Fultz Avenue fire.

{¶54} Therefore, the trial court did not err in allowing Mr. Ford's statements into evidence

*Ford*, 2023-Ohio-2220, at ¶¶ 44-47, ¶¶ 51-54 (emphasis, brackets, and alterations in original); (*see* ECF Doc. 7-1, pp. 608-14.)

### 3. The Claim in Ground One is Without Merit

In Ground One, Mr. Ford asserts that the state court appellate decision upholding the admission of his May 2017 statements was "contrary to and an unreasonable application of the federal law set forth in *Miranda* . . . and *Edwards*," and "based on [an] unreasonable determination of the facts in light of the evidence presented at trial." (ECF Doc. 1-1, pp. 6-7; *see* ECF Doc. 1, p. 6.) These arguments align with the AEDPA requirements that he show either that the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §§ 2254(d)(1)-(2); *Cullen*, 563 U.S. at 181. For the reasons set forth below, the undersigned concludes that Mr. Ford has not met either standard in this case.

Mr. Ford's claim in Ground One turns on several assertions. First, he asserts that he "articulated his right to counsel in several ways" that amounted to "an unequivocal request for counsel." (ECF Doc. 1-1, p. 5; ECF Doc. 19-1, pp. 11-14.) Second, he asserts that Officer Looney "admitted that he understood Petitioner had invoked his right to counsel prior to questioning." (ECF Doc. 1-1, p. 6; *see* ECF Doc. 19-1, pp. 15-17.) And third, he contends that the police officers ultimately "refused to honor [his] request for counsel and continued to

badge[r] [him] into ongoing conversation." (ECF Doc. 1-1, pp. 5-6; *see* ECF Doc. 19-1, pp. 11-15.)  The undersigned will address these contentions in turn.

### i.  Petitioner Has Not Shown That the State Court Erred Under AEDPA When it Found Petitioner Did Not Invoke His Right to Counsel

The state court of appeals explained its finding that Mr. Ford did not unambiguously assert his right to counsel under *Miranda* as follows:

> Mr. Ford's remarks that he would "rather" have counsel now, or talk to a lawyer, were not definitive. While these remarks indicate a preference for counsel, they do not rise to a level of the invocation of Mr. Ford's right. . . . Mr. Ford's multiple ambiguous references regarding counsel, in conjunction with his ongoing questions about the investigation and assertions of innocence, created enough confusion for Sergeant Looney to re-*Mirandize* Mr. Ford in order to keep speaking with him. . . .

*Ford*, 2023-Ohio-2220, at ¶¶ 51-52 (citations omitted).  In support, the state court relied on the Supreme Court's finding in *Davis* that an officer need not terminate an interrogation based on a "reference to an attorney that is ambiguous or equivocal in that a reasonable police officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel[.]" *Id.* at ¶¶ 46-47 (quoting *Davis*, 512 U.S. at 459).

In challenging the state court's conclusion, Mr. Ford points to times during his police interview when he referenced his right to counsel, saying things like: "Let's hold it, I rather have counsel now." (ECF Doc. 19-1, p. 11 (citing ECF Doc. 16, p. 13).)  He also asserts that Sergeant Looney "kept badgering Petitioner by re-introducing Looney's desire to talk to him," despite his "unequivocal" requests for counsel. (*Id.* at pp. 11-12 (citing ECF Doc. 16, pp. 13-15).)  In addition, Mr. Ford contends that he "never initiated any form of communication, exchanges, or conversation with Detective Looney and Detective Bell." (*Id.* at p. 13.)

A review of relevant portions of the interview transcript reveals the following exchanges:

DETECTIVE LOONEY:  Let's go back to the very beginning of us, the reason why we came to your house initially.

17

STANLEY FORD:  Okay.  Let's hold it.  I'd rather have counsel now.

DETECTIVE LOONEY:  Okay.

STANLEY FORD:  Because you guys got warrants that I did it.  I'm telling you I didn't do it.  I'd just rather have counsel now.

DETECTIVE LOONEY:  Okay.  All right.  All right.  Well, if at any time you choose to talk to us, you know, still available.  You still got my card, right?

STANLEY FORD:  Yeah.

DETECTIVE BELL:  Explain -- explain his charges.

DETECTIVE LOONEY:  Yeah, the charges, you have seven counts of -- let me show you.

STANLEY FORD:  I don't know how I'm being charged.  I didn't do it.  That's stuff I didn't do.

DETECTIVE LOONEY:  If you choose to talk to us, I really want to talk to you, but I can't unless you want to talk?

STANLEY FORD:  No.

DETECTIVE LOONEY:  If you want to talk to us, I'll read your rights again, and you can --

STANLEY FORD:  I'd rather have counsel now because you're accusing me of something I didn't do.

DETECTIVE LOONEY:  Again, Mr. Ford, if you want to talk to us -- listen to me. If you want to talk, I would love to talk to you.  But I'm going to read your rights again and you have to agree that you want to talk and we can talk.  I want to talk to you.

STANLEY FORD:  What are you going to do?  You guys already got a warrant.

DETECTIVE LOONEY:  Let me explain it.

STANLEY FORD:  You gonna take me to jail.

DETECTIVE LOONEY:  Well, let me explain it.  There's reasons though.  We need reasons and we need back to back story, okay?

STANLEY FORD:  So what?

18

DETECTIVE LOONEY:  <u>Do you want to keep talking to me and maybe</u> --

STANLEY FORD:  <u>I'd rather talk to a lawyer, man.</u>

DETECTIVE LOONEY:  That's fine.

STANLEY FORD:  Okay.

DETECTIVE LOONEY:  Just let me know if you keep talking -- I want to let you know, if you do, I'm here.

STANLEY FORD:  All right.

DETECTIVE LOONEY:  I don't know how long you're going to be here.  I'll sit here.

STANLEY FORD:  All right.

DETECTIVE LOONEY:  Okay?

STANLEY FORD:  All right.

DETECTIVE BELL:  Do you know why you're here today?

STANLEY FORD:  No, I don't.  They called -- they called --

DETECTIVE BELL:  Okay.  Well, we're going to explain why you're here.

STANLEY FORD:  Okay.

DETECTIVE LOONEY:  The reason you're here, we signed warrants for you because, like I said in the car before, if I proved it; we've proved it.

STANLEY FORD:  You all believe that I did it.

DETECTIVE LOONEY:  No.  No.  We've proved that you done it.

STANLEY FORD:  How?  How do you know?

DETECTIVE LOONEY: You know the work that we've done, all the investigating we've done.  <u>I'll just explain the charges to you.</u>

STANLEY FORD:  <u>Go ahead.  Yeah, go ahead.</u>

DETECTIVE LOONEY:  This is just charges.

STANLEY FORD:  Yeah.  Right.

19

DETECTIVE LOONEY:  Now, if you want to talk, I would love to.  I want to talk. All day long.

STANLEY FORD:  What I'm saying is, I can't talk about something I didn't do.

DETECTIVE LOONEY:  Well, what I'm saying is this:  If you want to talk about all of everything surrounding that --

STANLEY FORD:  I didn't do that.  I wouldn't dare do that, man.

DETECTIVE LOONEY:  Do you want me to explain the charges to you or do you want --

STANLEY FORD:  Go ahead.  I didn't do it.  I'm serious.  I didn't do it.  I'm not going to admit to that.  I didn't do it.  If I did, I'd admit to it.  I didn't do that.

DETECTIVE LOONEY:  Let me explain the charges.

STANLEY FORD:  Go ahead.

DETECTIVE LOONEY:  Okay.  You have seven counts of aggravated murder.

STANLEY FORD:  Okay.

DETECTIVE LOONEY:  And you have a count of aggravated arson.

STANLEY FORD:  All right.

DETECTIVE LOONEY:  Those are your charges.

STANLEY FORD:  Okay.  I didn't do it.

DETECTIVE LOONEY:  Okay.  Since you requested counsel, and like I said, if we walk out, if you change your mind, knock on the door or let's just say hey, I want to talk and then we'll come back in.

STANLEY FORD:  So what's going to happen now?

DETECTIVE BELL:  Hold on.

STANLEY FORD:  What's going to happen now?

DETECTIVE BELL:  You're being charged with the arson.

STANLEY FORD:  But why?

20

DETECTIVE LOONEY:  <u>The why is what we want to talk to you about, but if you</u> <u>want counsel, then you can go with that right.</u>  <u>But if you change your mind, then</u> <u>you let us know</u>.

STANLEY FORD:  <u>I mean -- I mean -- go ahead</u>.

DETECTIVE BELL:  We need your side of the story.

STANLEY FORD:  Johnny, I'm being honest, man.  I didn't do anything.  I mean, I cannot witness somebody -- I don't know who dare to did that.  I got too much to lose, man.

\*\*\*

DETECTIVE LOONEY:  Like I said, we want to talk to you, and we can explain everything, everything that we -- the reason why we have proof.  If you want to talk, we have to -- I have to re-read your rights and we'll talk.

STANLEY FORD:  You did.

DETECTIVE LOONEY:  <u>Like I said, if you want to talk to us, I'll re-read them</u> <u>right now, and we can talk</u>.  Let's talk.

STANLEY FORD:  I did talk.

DETECTIVE LOONEY: <u>I mean, if you wanted -- I have to read your rights to you</u> <u>again.  I can't keep talking to you</u>.

STANLEY FORD:  Detective Looney, you want me to admit to something I didn't do.

DETECTIVE LOONEY:  <u>I can't keep talking to you unless I feel -- unless you</u> <u>bring me the green light saying I waive my right to counsel</u>.  I have to read your verbal Miranda to you again.  I want to be very specific and have you sign saying I want to talk.

STANLEY FORD:  I didn't do that, Johnny.  I didn't do that.

DETECTIVE BELL:  We're here to get the truth.  That's all we want.

STANLEY FORD:  Okay.  I understand that.  I'm going to tell you something, man.  I see you around and I see you around.  Man, if I could help you, I would, man.

DETECTIVE BELL:  We're here to get to the truth, Stanley.

21

STANLEY FORD:  Huh?

DETECTIVE BELL:  We're here to get to the truth.

STANLEY FORD:  I understand that, man.  I didn't do that.  I'm serious.  I didn't do that, man.  I didn't do that.  I cried, man, for you all.  I didn't do that.

DETECTIVE LOONEY:  How about this.  How about I read you your rights again and then I tell you why I know you did it?

STANLEY FORD:  Go ahead.

(ECF Doc. 16, pp. 12-21 (emphasis added).)  Thereafter, Detective Looney read Mr. Ford his *Miranda* rights again, and Mr. Ford acknowledged that he understood them.  (*Id.* at pp. 21-23.)

The undersigned turns first to Mr. Ford's assertion that the state appellate court made a decision that was "contrary to and an unreasonable application of the federal law set forth in *Miranda* . . . and *Edwards*" (ECF Doc. 1-1, p. 6), when it found "Mr. Ford's remarks that he would 'rather' have counsel now, or talk to a lawyer, were not definitive" and did not "rise to a level of the invocation of Mr. Ford's right" to counsel, *Ford*, 2023-Ohio-2220, ¶ 51.

*Miranda* is not directly relevant here, since it established the relevant procedural safeguards but did not address an invocation of a right to counsel under those safeguards.  *See* 384 U.S. 436.  But the Supreme Court did find in *Edwards* that a suspect had invoked his right to counsel when he said: "I want an attorney before making a deal."  451 U.S. at 479.  Because he had "expressed his desire to deal with the police only through counsel," the Supreme Court found the suspect could not be subjected to further interrogation until counsel was made available or the suspect "himself initiate[d] further communication, exchanges, or conversations with the police."  *Id.* at 484-85.  In contrast, the Supreme Court held subsequently in *Davis* that a suspect who said "[m]aybe I should talk to a lawyer" had not "clearly request[ed] an attorney," and officers therefore were not required to stop his questioning.  512 U.S. at 462.

22

In applying the above Supreme Court precedent, the Sixth Circuit has held that suspects failed to articulate an unambiguous request for counsel as described in *Davis* when they "mentioned an attorney" or "asked if [they] needed one," or when they made the following types of statements: "I think I should talk to a lawyer, what do you think?"; "'[I]t would be nice' to have an attorney."; "I really should have a lawyer, huh?"; "I think I need a lawyer"; and "I guess you'll just have to go on and lock me up then and call my lawyer, cause I don't, I don't know what you're talking about." *See, e.g., England v. Hart*, 970 F.3d 698, 708 (6th Cir. 2020) (citations omitted); *United States v. Potter*, 927 F.3d 446, 451 (6th Cir. 2019) (citations omitted); *Henness v. Bagley*, 644 F.3d 308, 319-20 (6th Cir. 2011).  Conversely, suspects were found to have invoked their right to counsel when they asked to be left alone until they could see their attorney, directed officers to call their attorney's phone number, and said "maybe I should talk to an attorney by the name of William Evans." *See Potter*, 927 F.3d at 451 (citations omitted).

Neither the cited Supreme Court precedent nor the Sixth Circuit decisions interpreting that precedent squarely address the present situation, where a suspect told officers "[l]et's hold it" and said four times that he would "rather have counsel now" or "rather talk to a lawyer" and answered "no" after being told that officers could not talk to him "unless [he] want[ed] to talk," but then said "go ahead" repeatedly when officers offered to explain the charges, asked "what's going to happen now" when officers indicated they would walk out, was advised repeatedly that officers could not keep talking to him without an explicit waiver of the right to counsel, then said "go ahead" when an officer said he should let the officers know if he changed his mind about wanting counsel so they could talk, and again said "go ahead" when an officer said he would read his rights again and then "tell you why I know you did it."  (*See* ECF Doc. 16, pp. 12-21.)

23

Importantly, this Court is not tasked with independently determining how the standards in *Edwards* and *Davis* would best be applied to the facts in Mr. Ford's case. Instead, this Court must consider whether the findings of the state court were "contrary to" those Supreme Court standards—i.e., whether the decision contradicted those standards or arrived at a different result despite materially indistinguishable facts—or whether the state court findings resulted in an "unreasonable application" of the law—i.e., whether the decision correctly identified the standard but unreasonably applied it to the facts. *See Reed*, 134 F.4th at 459 (citations omitted). In making this determination, this Court must consider whether "'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101. In other words, the question is not "whether the officers *could* have interpreted [Mr. Ford]'s statement as an unambiguous request for an attorney, but whether it was objectively unreasonable for the [state court of appeals] to conclude otherwise." *England*, 970 F.3d at 711 (emphasis in original).

Here, the state court of appeals concluded that Mr. Ford's use of the word "rather" was "not definitive," and that his "multiple ambiguous references regarding counsel, in conjunction with his ongoing questions about the investigation and assertions of innocence" created enough confusion to lead officers "to re-*Mirandize* Mr. Ford in order to keep speaking with him." *Ford*, 2023-Ohio-2220, ¶¶ 51-52. Considering the governing Supreme Court precedent and the facts of the case, as outlined above, the undersigned must conclude that Mr. Ford has failed to show that the state court's finding "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" under 28 U.S.C. §§ 2254(d)(1). Certainly, Mr. Ford has not shown that "fairminded jurists" would all agree that the state court's decision was incorrect. Indeed, as the Sixth Circuit observed in *England*, "the very fact that many courts have considered this issue and reached differing

24

conclusions—in other words, 'fairminded jurists [ ] disagree[d],'—supports [a] conclusion that the state court did not unreasonably apply federal law." *England*, 970 F.3d at 711 (quoting *Yarborough*, 541 U.S. at 664) (alterations in original).  Accordingly, the undersigned concludes that Mr. Ford has failed to support an AEDPA challenge under 28 U.S.C. § 2254(d)(1) to the state court's finding that he did not clearly invoke his right to counsel.

The undersigned also turns briefly to Mr. Ford's argument that the state court's decision was also "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" under 28 U.S.C. § 2254(d)(2).  (*See* ECF Doc. 1-1, p. 7.)  In support of this assertion, Mr. Ford argues that the state court "conducted an incorrect analysis of the specific phrases that Petitioner used[,] finding that his statements regarding [the] request for counsel were 'not definitive' and indicate a 'preference for counsel' not an invocation of his right to counsel." (*Id.*)  In so arguing, Mr. Ford does not identify specific factual findings as inconsistent with or unsupported by the evidence in the trial record.  Rather, he challenges the court's legal characterization of his undisputed statements to police.  (*Id.*)  Because Mr. Ford has failed to show that "the state court's presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not have support in the record," the undersigned concludes that he has failed to support a challenge under 28 U.S.C. § 2254(d)(2) to the state court's finding that he did not invoke his right to counsel.  *See Matthews*, 486 F.3d at 889 (citations omitted).

### ii. The Police Officer's Subjective Beliefs Do Not Change the Analysis

Based on his allegation that Detective Looney admitted "he understood Petitioner had invoked his right to counsel prior to questioning" (ECF Doc. 1-1, p. 6), Mr. Ford also argues in the Traverse that the state court improperly "substitute[d] its own interpretation" of Mr. Ford's statements regarding counsel when it failed to consider testimony from Sergeant Looney indicating that he was aware Mr. Ford was requesting an attorney.  (*See* ECF Doc. 19-1, pp. 15-

25

17 (citing ECF Doc. 7-2, p. 129 (Tr. 127:20-22)).) Mr. Ford argues that the state court "acted contrary to established federal precedent" and made a decision "based upon an unreasonable determination of facts in light of the evidence presented in the State court proceedings" when it "disregarded" Sergeant Looney's admission "that he reasonably understood that Petitioner unambiguously requested [] counsel" and then "substituted its own interpretation." (*Id.* at 17.)

This argument misapprehends the applicable legal standard. When the Supreme Court held that a suspect must "unambiguously request counsel" for the *Edwards* prophylactic rule to apply, it explained that the suspect must "articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis,* 512 U.S. at 459. The Court specifically explained that courts must undertake "an objective inquiry," in order "[t]o avoid difficulties of proof and to provide guidance to officers conducting interrogations." *Id.* The state court of appeals also recognized in its opinion that the law requires an objective analysis. *See Ford*, 2023-Ohio-2220, at ¶ 47 (quoting *Davis* 512 U.S. at 459). Thus, the law did not require the state court to give deference to Sergeant Looney's subjective beliefs, and it is clear from the state court decision that the state court also understood it was obligated to perform an objective analysis.

Mr. Ford has therefore failed to show that the state court's reliance on an objective analysis, rather than Sergeant Looney's subjective beliefs, "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" under 28 U.S.C. §§ 2254(d)(1). Certainly, Mr. Ford has not shown that "fairminded jurists" would all agree that the state court's analysis was incorrect.

Further, because the law requires an objective analysis, Mr. Ford has failed to show that the lack of discussion of Sergeant Looney's testimony regarding his subjective beliefs resulted in

a state appellate court decision that was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" under 28 U.S.C. § 2254(d)(2).  Mr. Ford has accordingly failed to show that "the state court's presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not have support in the record." *Matthews*, 486 F.3d at 889 (citations omitted).

### iii.    Further Interrogation Was Not Precluded Under the Circumstances

Finally, the governing analysis is not impacted by Mr. Ford's additional argument that the police officers "refused to honor [his] request for counsel and continued to badge[r] [him] into ongoing conversation."  (ECF Doc. 1-1, pp. 5-6; *see* ECF Doc. 19-1, pp. 11-15.)  The Supreme Court explicitly declined to "require law enforcement officers to cease questioning immediately upon the making of an ambiguous or equivocal reference to an attorney."  *Davis*, 512 U.S. at 459 (citations omitted).  While a suspect's unequivocal invocation of his right to counsel would require police to "immediately cease questioning him until an attorney is present," the Supreme Court was "unwilling to create a third layer of prophylaxis to prevent police questioning when the suspect *might* want a lawyer."  *Id.* at 462 (emphasis in original).  It therefore held: "Unless the suspect actually requests an attorney, questioning may continue."  *Id.*

In Section III.B.3.i., *supra*, the undersigned concluded that Mr. Ford had failed to support an AEDPA challenge under 28 U.S.C. § 2254(d)(1) or (d)(2) to the state court's finding that Mr. Ford did not clearly invoke his right to counsel as required under *Davis*.  Given that finding, the undersigned must also conclude that Mr. Ford has failed to support a challenge based on the police officers' continued questioning despite Mr. Ford's statements regarding counsel.

For all the reasons set forth above, the undersigned finds that Mr. Ford has not shown that the state appellate court's decision was contrary to or an unreasonable application of clearly established federal law, or that the state court's decision was based on an unreasonable

determination of the facts in light of the evidence presented.  *See* 28 U.S.C. §§ 2254(d)(1), (2).

Accordingly, the undersigned recommends that the Court **DENY** Ground One on its merits.

### IV.    Recommendation

For the reasons set forth herein, the undersigned recommends that the Court **DENY**

Ground One, the sole claim for relief in the Petition.

DATE:    June 1, 2026

/s/ *Amanda M. Knapp*
AMANDA M. KNAPP
UNITED STATES MAGISTRATE JUDGE

### **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).